FILED
2022 JUN 14
CLERK
U.S. DISTRICT COURT

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

OSCAR JONES,

*Plaintiff*,


vs.                                                                  CIVIL ACTION NO/ 2:22-cv-00302


CITY/MUNICIPALITY OF COTTONWOOD HEIGHTS, UTAH,

COTTONWOOD HEIGHTS POLICE DEPTARTMENT ("CHPD"),

CHPD OFFICER ZEPHANI HUANG,

CHPD OFFICER KYLE MAHONEY,

CHPD SERGEANT GARY YOUNG,

CHPD Officer #4, whose identity is currently unknown,

CHPD POLICE CHIEF ERNEST ROBERT/ROBBY RUSSO,

COTTONWOOD HEIGHTS CITY MANAGER TIM TINGEY

*Defendants*.


## FIRST AMENDED COMPLAINT


### Jury Trial Demanded


This civil action arises from the May 5, 2021, arrest of plaintiff Oscar Jones

at the private residence located at 8450 Splendor Way, Salt Lake City, UT, 84121,

in the basement living area, after a police officer demanded plaintiff produce

identification and plaintiff lawfully declined to do so. This action is brought

pursuant to 42 U.S.C. § 1983, the United States Constitution, the Utah State

Constitution, and the laws of the State of Utah, including the Governmental

Immunity Act of Utah, Utah Code § 63G-7-101 et seq.

## JURISDICTION

1.   The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331,

1332, and 42 U.S.C. § 1983.  Also, the supplemental jurisdiction of this Court to

hear any claims arising under state law is invoked pursuant to 28 U.S.C. §1367.

Venue is appropriate under §1391 (b).

## PLAINTIFF

2.   The plaintiff, Oscar Jones, is an adult resident citizen of Denver, CO.

## DEFENDANTS

3.   Defendant Cottonwood Heights, Utah is a municipality in the State of

Utah adopting the "Council-Manager" form of government as that term is defined

in Utah Code ("U.C.") Section 10-3b-103 (7)(a).

4.   Defendant Cottonwood Heights Police Department ( "CHPD") is a

police department in Cottonwood Heights. CHPD implements a practice (1) of

illegally compelling citizens to produce personal identification documents ("ID"),

and (2) of training its employees to fabricate, tamper with, destroy, fail to disclose,

and/or minimize the existence of in general, objective evidence of their interactions

with civilians. Each policy is pervasive and long-standing within the department

such that written or not, it carries the force of law.

5.   Defendant Zephani Huang is a police officer under the employ of CHPD.

At all times pertinent to this complaint, she was acting in the course and scope of

her employment and under the color of law. Her actions as set forth in this

complaint demonstrate reckless indifference to the federally protected rights of

plaintiff, fraud, willful misconduct, fabrication of evidence, and with conscious

disregard for the rights of plaintiff, failure to disclose evidence that was known to

her to be relevant to a material issue in a pending judicial proceeding.

6.   Defendant Kyle Mahoney is a police officer under the employ of CHPD.

At all times pertinent to this complaint, he was acting in the course and scope of

his employment and under the color of law. His actions as set forth in this

complaint demonstrate reckless indifference to the federally protected rights of

plaintiff, and with conscious disregard for the rights of plaintiff, failure to disclose

evidence that was known to him to be relevant to a material issue in a pending

judicial proceeding.

7.   Defendant Gary Young is a police sergeant at CHPD. At all times pertinent to this complaint, he was acting in the course and scope of his employment and under the color of law. His actions as set forth in this complaint demonstrate reckless indifference to the federally protected rights of plaintiff, fraud, and fabrication of evidence.

8.   Defendant Officer #4 is a police officer under the employ of CHPD. At all times pertinent to this complaint, he was acting in the course and scope of his employment and under the color of law. His actions as set forth in this complaint demonstrate reckless indifference to the federally protected rights of plaintiff. His identity is not currently known because CHPD has not disclosed it.

9.   Defendant Ernest Robert/Robby Russo is the Chief of Police at CHPD. Mr. Russo is the chief policy making official at CHPD. His actions as set forth in this complaint demonstrate influence on policy, reckless indifference to the federally protected rights of all citizens within CHPD's jurisdiction, including plaintiff, fraud, willful misconduct, knowingly giving false testimony material to this *matter of inquiry*, evil intent, malicious prosecution, and with a conscious disregard for the rights of others, failure to disclose evidence that was known to him to be relevant to a matter of inquiry in a pending judicial proceeding.

10.   Defendant Tim Tingey is the City Manager of Cottonwood Heights. Mr. Tingey is the chief executive officer of Cottonwood Heights and has the power to appoint individuals to municipal offices and positions, including the municipal position of Police Chief, currently occupied by Mr. Russo. All Cottonwood Heights employees, including Mr. Russo, report to the Mr. Tingey. Mr. Tingey is charged with ensuring proper and lawful operation of all offices and departments within Cottonwood Heights, including CHPD. His actions as set forth in this complaint demonstrate influence on policy and reckless indifference to the federally protected rights of all citizens within CHPD's jurisdiction, including plaintiff.

## FACTUAL ALLEGATIONS

11.   On May 5, 2021, plaintiff was working at his desk in the basement of the private residence located at 8450 Splendor Way, Salt Lake City, UT, 84121, a space he had permission to occupy until May 8, 2021 via a written rental agreement with the owner of the property, when CHPD Officer Zephani Huang ("Officer Huang") and a male officer who, upon information and belief, is named Kyle Mahoney ( "Officer Mahoney") responded to a call alleging plaintiff was there without permission.

12.   The officers, upon arriving, conducted a voluntary interview with plaintiff, wherein (a) plaintiff's name became clearly established such that there was no question as to its authenticity, and (b) it became clearly established that plaintiff was not engaged in criminal activity.

13.   Plaintiff showed Officer Huang and Officer Mahoney his rental agreement, which established he had permission to occupy the space. Officer Mahoney verbally represented that he was satisfied that plaintiff had not committed any crime.

14.   Officer Mahoney took down contact information from a civilian witness "J", another tenant of the property of approximately the same age as plaintiff who was present for and observed the entire interaction between plaintiff and CHPD officers. Some of the information that Officer Mahoney gathered from "J" was obtained from an ID document that "J" voluntarily produced upon request.

15.   When Officer Mahoney was finished taking information from "J", he asked plaintiff to produce his ID. Plaintiff declined to produce his ID. When plaintiff declined to produce his ID, Officer Mahoney stated something to the effect of: *"Come on, **don't make this hard**, **we're finished with our investigation**, we just need to collect your information for our notes. We need to see your ID to*

*confirm you are who you say you are. Once we finish noting your name, date of birth, etc. from your ID **we are going to leave**."*

16.   Upon information and belief (to wit: Case 2:21-cv-00639, also before this court, hereafter referred to as the "Ellis Case", Document 2 Page 7-9*), on December 8, 2018, Officer Mahoney and CHPD Sergeant Morzelewski made similar statements to Mr. Ellis, a plaintiff in that case. Following are relevant excerpts from their conversation with Mr. Ellis:

- Morzelewski: "[Mr. Ellis], do you have your ID?"
- Ellis: "Yes, sir."
- Morzelewski: "Can we get that?"
- Morzelewski: "… **We just need to get your ID**."
- Morzelewski: "**We just need your ID**, boss."
- Mahoney: "**And then we're out of here**".
- Morzelewski: "**We just need your ID**."
- Mahoney: "You need to provide your identification."
- Mahoney: "**You're making a bigger deal than this**." [sic]
- Ellis: "I just asked you not to be in my room."
- Mahoney: "**I just asked you for some ID** and to come talk to me."
- Ellis: "Please get out of my room, please?"
- Morzelewski: "No."
- Ellis: "You do have to".
- CHPD Sergeant Eatchel: "Okay. If you want us out, then you come out with us."
- Ellis: "No, I don't have to go out with you."
- Eatchel: "Okay, **give us your ID.**"
- Ellis: "I can talk to you at the door."
- Eatchel: "**Give us your ID.**"

17.   Utah state law does not, in any circumstance, authorize police officers to compel a civilian to produce ID. Utah law only authorizes police officers to compel a person to disclose their name or date of birth, and even then, only in limited circumstances (U.C. §76-8-301.5). Notwithstanding the fact that such limited circumstances likely did not apply insofar as plaintiff was not a suspect of any crime and therefore not subject to a legal stop, plaintiff nevertheless disclosed his name and his age to the officers several times.

18.   Upon information and belief, in telling plaintiff *"we just need to collect your information for our notes,"* Officer Mahoney was referring to a CHPD practice requiring CHPD officers to collect personal information from all civilians with whom they make contact, without regard to the limitations on such practices proscribed by law.

19.   The authenticity of plaintiff's verbal disclosure of his name and date of birth was never in question. Several witnesses, including the owner of the property, had confirmed plaintiff's name and date of birth to Officer Huang and Officer Mahoney. Furthermore, Sergeant Young, Officer Huang, and Officer Mahoney had all independently verified plaintiff's name and date of birth prior to arresting him.

20.   A police dispatch record shows that at 16:00, approximately 38 minutes before illegally arresting plaintiff, Officer Huang initiated a "Records Management System Query" for "PERS-NAME: JONES  G1: OSCAR  AGE: 23  STATE: UT".

21.   A police dispatch record shows that at 16:36, approximately 2 minutes before plaintiff's illegal arrest, Officer Mahoney initiated a "Records Management System Query" for "PERS-NAME: JONES  G1: OSCAR  STATE: UT".

22.    Plaintiff is in fact JONES OSCAR and his age was in fact 23.

23.   At 16:37:35, approximately 1 minute after initiating the query, Sergeant Young's body camera footage depicts Officer Mahoney showing a picture on his phone to Officer Huang and Sergeant Young of plaintiff's California-issued driver's license. On the driver's license is a picture of plaintiff, which establishes that plaintiff and the owner of the driver's license are the same person. Officer Huang, Officer Mahoney, and Sergeant Young all knew before arresting plaintiff: (a) plaintiff's name and date of birth, and (b) that plaintiff had truthfully disclosed the same. The police officers had no lawful authority then, or at any other point in time for that matter, to compel plaintiff to produce ID. Even if they were mistaken *in good-faith* about the bounds of their lawful authority, after obtaining a copy of plaintiff's driver's license, they had no *good-faith* reason to demand that plaintiff

produce his ID. They had already independently verified plaintiff's identity using precisely the information plaintiff disclosed in accordance with U.C. §76-8-301.5.

24.    Reiterated: neither in the instant scenario, nor in any other scenario, does Utah law require its citizens to produce ID, upon a police officer's request.

25.    Because plaintiff was seated at his desk and therefore had easy access to the internet, he looked up the applicable statutes and read aloud the same so that Officer Huang could hear, and to establish clearly, that he was not breaking the law by declining to produce his ID. Officer Huang acknowledged plaintiff's reading.

26.    When it became clear to Officer Huang that plaintiff would not voluntarily produce his ID, she and Officer Mahoney retreated to talk privately amongst themselves. When they finished their discussion, they informed plaintiff that a supervisor was on his way.

27.    Police dispatch records show that Sergeant Young was called to the scene at 16:20:32, and his body camera shows he arrived at the basement area at 16:32:21.

28.    When plaintiff was informed that a supervisor was on his way, he stood up from his chair and attempted to leave. An officer stood in his way, blocking his path and preventing him from leaving. Plaintiff verbally expressed his desire to

leave and was told he was not allowed to leave until the supervisor arrived.
Plaintiff waited until the supervisor arrived.

29.   When Sergeant Young arrived, he conferred with Officer Huang for
approximately 6 minutes. Some of the audio portion of this conversation was
recorded by Sergeant Young's body camera and some was not.

30.   The very first thing Officer Huang says to Sergeant Young is *"my body
camera isn't working first of all. It just won't turn on."* Later in their conversation,
Huang puts on a facial covering / mask, which she had not been wearing until now,
at which point Young *immediately* reaches to his body camera and turns off the
audio recording element of his body camera.

31.   CHPD has received three total requests to produce body cam footage
depicting the encounter described in this claim. The first was when counsel for
plaintiff in the related criminal case, which has since been dismissed without
prejudice "in the interest of justice", requested that CHPD produce (in addition to
other evidence) all body camera recordings of the encounter within their
possession. CHPD produced only one piece of footage, that taken by Sergeant
Young's body camera. The second was when plaintiff submitted a request pursuant
to U.C. §63G-2 ("GRAMA") for the same records, and additionally, for any
footage produced, the associated name of the officer who was wearing the body

camera which recorded it. In response to the GRAMA request, CHPD produced two pieces of footage recorded on May 5, 2021. CHPD failed to produce the requested officer names. One of the pieces of footage was readily identifiable as the same footage previously produced (that recorded by Sergeant Young's body camera), but this time, CHPD had superimposed a heavy visual blur and deleted nearly all of the audio. It was so heavily redacted that it would have been completely useless but for the fact plaintiff already possessed the same footage without redactions. The other piece of footage, which had not been previously provided to plaintiffs' counsel in the criminal proceeding despite his request, is approximately **five minutes** of footage, redacted in the same fashion (muted and blurred), recorded by a fourth officer ("Officer #4"), who had been present for nearly the whole encounter, which had lasted approximately **forty-five minutes.** Officer #4 is not named in this complaint because although plaintiff requested that CHPD disclose Officer #4's name (but not his date of birth), CHPD failed to do so.

32.   Section 77-7a-104 (6) of the Utah Code states: *"When going on duty and off duty, an officer who is issued a body-worn camera shall record the officer's name, identification number, and the current time and date, unless the information is already available due to the functionality of the body-worn camera."*

33.   In providing the footage entirely redacted, notwithstanding the fact that some portions of both could lawfully have been classified as "private" due to

having been recorded inside a home or residence, CHPD was in violation of

Section 63G-2-202 (1)(a) of the Utah Code which states: *"[A] governmental entity*

***shall***, *upon request, disclose a private record* **to the subject of the record**.*"*

Plaintiff was the subject of the record as clearly indicated on the GRAMA request

form, which provides a checkbox for "I am the subject of the record." Plaintiff had

checked the box. U.C. §63G-2-202 (1)(a) does not say that a government entity

may, in its sole discretion, redact the record completely before providing it to the

subject of the record.

34.   When plaintiff was released from jail on May 6, 2021, staff at the jail

advised him that notwithstanding the terms of his "Jail Release Agreement"

wherein he signed *"I will not knowingly enter onto the premises of the alleged*

*victim's residence,"* that plaintiff could retrieve his property, all of which, except

for his vehicle, was inside the residence, by asking CHPD to send an officer to

escort him onto and within the residence. Plaintiff called CHPD's non-emergency

phone number and asked them to send an officer to help retrieve his property.

35.   Police records show that after receiving plaintiff's call, CHPD

dispatched Sergeant Ken Eatchel to the residence. In the same GRAMA response

containing the two heavily redacted pieces of footage from the previous day,

CHPD also produced approximately 13 minutes of totally unredacted footage as

recorded by Sergeant Eatchel's body camera on May 6, 2021. It represented the

whole length of the encounter. The final 84 seconds of the interaction can fairly be described as (a) Sergeant Eatchel stating, in a patently incorrect interpretation of the jail release agreement, *"technically, you can't even be here, **this** is considered at the residence,"* defining *"**this**"* with a wide, hands-outstretched motion as if to indicate roughly *"anywhere within sight of the residence"* including where plaintiff was standing, (b) plaintiff asserting that he already intended to bring an action for *"false arrest"* in light of the previous days' events, inviting Sergeant Eatchel to *"add to that"* by arresting him for *"being on public property, and not in violation of anything"* and stating explicitly his *"every intention to be in compliance with the order"* if left un-molested, and (c) Sergeant Eatchel, opting not to arrest plaintiff, ending the encounter by walking back to his car. What is notable about the final 84 seconds of this interaction is that Sergeant Eatchel was right then made aware of the possibility of an official proceeding or investigation about to be instituted. If at any time after this interaction Sergeant Eatchel, **or any CHPD employee to whom he relayed this information**, *(a) altered, destroyed, concealed, or removed any thing or item, with the purpose of impairing the veracity or availability of the thing or item* as pertaining to the possible investigation (i.e., the instant complaint), or *(b) made, presented, or used any thing or item which the person knew to be false with the purpose of deceiving a public*

*servant **or any other party**,* then such person would be guilty of tampering with ("fabricating") evidence per U.C. §76-8-510.5.

36.   Upon information and belief, CHPD knew that no footage recorded by Sergeant Eatchel's body camera on May 6, 2021, could possibly provide indication as to the intent of the officers who had arrested plaintiff the previous day, a material issue in determining whether the officers are entitled to immunity from suit. Accordingly, they appear to have had no trouble producing the footage in full and without redactions. By contrast, it seems as though footage from the previous day was significantly more difficult to locate or produce in its entirety. Plaintiff, who is also (like "J") a software engineer, previously employed by Amazon Inc. in that capacity, and familiar with many ways that electronic devices and the software governing them can fail, speculates that perhaps body cameras owned by CHPD have a software bug wherein they sometimes randomly malfunction on odd days, but not on even days.

37.   On the instruction of a CHPD staff member who, when plaintiff asked for the name of Officer #4 and an explanation for the redactions, instructed plaintiff to *"Please submit a new GRAMA request for this information,"* plaintiff submitted his third request for information to CHPD and is still awaiting response.

38.   Four officers interacted directly with plaintiff on the day he was arrested, and all four should have had their body cameras turned on and recording for the duration of the encounter, as mandated by Section 77-7a-104 of the Utah Code. And yet, it can be inferred from CHPD's response to plaintiff's GRAMA request that CHPD possesses footage from only two body cameras. Furthermore, it *could have been inferred* from CHPD's response to the request made by plaintiff's counsel pursuant to the rules of Utah Criminal Procedure, which contained only the footage from Sergeant Young's body camera, that *they would have averred*, at *that* time, that they only possessed footage from Sergeant Young's body camera.

39.   **However** at the time of the same's initial production, CHPD *certainly also* possessed at *minimum* the five minutes of footage from Officer #4's body camera and *did not produce it,* despite knowing full well that it was (a) relevant to a material issue or matter of inquiry in a pending judicial proceeding and (b) requested of them by counsel for a party to the proceeding.

40.   Upon information and belief, in the previously referenced Ellis Case, when Mr. Ellis attempted to activate his cell phone's video recorder, CHPD officers *"without warning or explanation, grabbed Mr. Ellis, yanked him out of his home, electrocuted him with a handheld conductive energy device, handcuffed him facedown in the hallway, wrenched his handcuffed arms behind his back toward his head, and left him handcuffed behind his back for nearly two hours."* The

actions of the officers as alleged in the Ellis Case is evidence that CHPD and its officers are extremely averse to their interactions with civilians being recorded, and its officers are willing to, either on explicit instruction from CHPD leadership, or acting within the safety of knowledge that their leadership does not care, take extreme action in furtherance of CHPD policy to generally minimize the existence of any objectively verifiable recording(s) of their interactions with civilians, when such recordings depict clear misconduct.

41.   Upon information and belief, Officer Huang's statement: *"my body camera isn't working first of all. It just won't turn on"* is part of an established CHPD practice wherein its police officers are permitted to simply claim without consequence *"my body camera isn't working"* if in the officer's sole judgment, the officer does not want their instant behavior subject to later review for reasonableness. If such practice is permitted as approximately described -- i.e. permitting officers to intentionally impair the availability of evidence, i.e. evidence tampering as plainly described in U.C. §76-8-510.5 -- then Officer Huang had probably determined that a reasonable post-hoc review of her actions would not find her actions justifiable. It also might reasonably be inferred when considering Officer Mahoney's involvement in the Ellis Case, that when Officer Mahoney and Officer Huang had previously stepped away from plaintiff to speak privately amongst themselves, that Officer Mahoney advised or warned Officer Huang that

it would be in her best interest to falsely claim, as her very first statement to
Sergeant Young upon his arrival, that her body camera was not working. Officer
Mahoney would have been aware of the liability he was presently facing as a result
of his actions in the Ellis Case; although, perhaps in *his mind*, said liability was the
result *only* of body camera *recordings of his actions* having *not* been destroyed,
and he thought he might do his fellow officer a good service in advising her to
destroy her own body camera footage and tamper with that of Sergeant Young's.

42.   Notwithstanding Section 77-7a-103's provision that an officer is
allowed to deactivate a body-worn camera when consulting with another officer,
there are six indications which, interpreted together and in context, indicate that
Officer Huang donning her face mask was a non-verbal signal to Sergeant Young
to stop recording audio, in line with CHPD policy permitting evidence-tampering
(as defined in U.C. §76-8-510.5), to wit: (1) Sergeant *Eatchel's* footage from May
6, 2021 depicts Eatchel and another officer consulting with each other away from
plaintiff, but Eatchel does *not* stop recording audio. It can therefore be inferred that
there exists no CHPD policy -- unless Eatchel was breaking such policy --
stipulating officers *shall* stop recording audio when consulting with one another,
therefore Sergeant *Young* disabling his body cam's audio recording element was a
discretionary function, (2) the temporal relation between Officer Huang's cue and
Sergeant Young's reaction is approximately one second, (3) the last thing we hear

Officer Huang say -- right before Sergeant Young's audio cuts off -- is *"Hold on, I don't think-"*, (4) Officer Huang reaches to her radio with one hand and covers her mouth with her other hand, looks in Officer #4's direction, and speaks a message into her radio, presumably to Officer #4, and (5) this is the *exact moment in time* when, as CHPD avers in their response to plaintiff's GRAMA request, Officer #4's body camera ***either*** (a) *magically* begins recording; i.e., without *any* input from Officer #4, as evidenced by what can be seen on Sergeant Young's body cam *and* Officer #4's body cam, to wit: Officer #4's hand does not make *any movement whatsoever* until *after* his body cam allegedly begins recording ***or*** (b) was marked with some kind of "tag" or "cut" by Officer #4 so as to make it easier for CHPD staff to later split the footage at officer-marked points in time and then disclose some segments of footage but not others (also called "tampering with evidence" in Section 76-8-510.5 of the Utah Code.)

43.   CHPD has to-date not produced, nor provided any explanation as to why they have not produced, footage of the encounter recorded by Officer Mahoney's body camera.

44.   Footage of the entire encounter would be beneficial to plaintiff's claim, insofar as it would be evidence in determining CHPD officers' motive when they unlawfully detained and later arrested plaintiff, a material question in determining whether the officers are entitled to immunity from suit.

45.   Upon information and belief, CHPD is in possession of additional footage that has not to-date been disclosed, including at least the remainder of the encounter as recorded by Officer #4's body camera, and the entirety of the encounter as recorded by Officer Mahoney's body camera.

46.   In an unmuted portion of Sergeant Young's body camera footage, wherein Sergeant Young has just arrived and Officer Mahoney is walking toward him, Sergeant Young asks what the problem is; Officer Mahoney says, *"He won't identify himself,"* to which Sergeant Young exclaims, *"That's disorderly!"*

47.   Sergeant Young's exclamation, insofar as it indicates plaintiff committed any crime in the state of Utah, or any federal crime for that matter, is patently incorrect as a matter of law.

48.   When Sergeant Young is later conferring with Officer Huang, Officer Huang states, *"He's refusing to give his social, his phone number, his birthday, and he's refusing to give his address. He's also guilty of [criminal trespass], I literally looked up the code."* Sergeant Young responds, *"Do I arrest him for disorderly, or failure to identify himself?"* Officer Huang answers, *"Yeah, on all three."*

49.   It is not a crime in the state of Utah for any citizen to refuse to provide a police officer with their social security number, nor is it a crime to refuse to

provide a contact phone number. Also, Officer Huang was lying when she stated that plaintiff was refusing to give his address. Officer Huang knowingly impaired the veracity of the encounter's objective record as solely recorded by -- so is claimed by CHPD anyway -- Sergeant Young's body camera. In other words, she tampered with evidence, per a plain reading of U.C. §76-8-510.5. Body camera footage of the entire interaction would demonstrate that Officer Huang was lying to Sergeant Young unless she also on the same day that her body camera randomly malfunctioned suffered a temporary brain malfunction that rendered her unable to remember that 10 minutes prior plaintiff had told her multiple times, truthfully, that his address was the very same which she was occupying.

50.   When Officer Huang and Sergeant Young finished conferring, Officer Huang arrested plaintiff for FAILURE TO DISCLOSE IDENTITY (§76-8-301.5) and DISORDERLY CONDUCT AFTER REQUEST TO STOP (§76-9-102), although notably did not allege those crimes at the time of plaintiff's arrest, instead deferring the allegation of a specific crime until booking him into jail.

51.   The plaintiff was then transferred to the Salt Lake County Jail for booking, where he was held in custody until he was released the next morning.

52.   The plaintiff was not guilty of trespassing. Moreover, both Officer Huang and Sergeant Young knew plaintiff was not guilty of trespassing, nor did

they *suspect* plaintiff of being guilty of trespassing. Plaintiff showed Officer

Huang his lease agreement, and Officer Huang did not thereafter raise her revived

theory of criminal trespass *until plaintiff declined to produce his ID.* Furthermore,

after Officer Huang and Sergeant Young had finished bouncing various pretextual

probable-cause theories off one another for approximately 6 minutes, they

evidently concluded that they had no probable cause to arrest plaintiff for

trespassing.

53.   The plaintiff was not guilty of disorderly conduct, nor could any

reasonable officer, especially one in a high leadership position like Sergeant

Young, have interpreted plaintiff's conversations with the officers, all occurring in

a private setting, as a violation of Section 76-9-102 of the Utah Code. The statute

requires that the conduct which is alleged to be disorderly occur in public or with

the intent to cause public inconvenience, annoyance, or alarm. Plaintiff was neither

fighting, making unreasonable noise, nor obstructing vehicular or pedestrian

traffic. Plaintiff was not in a public place nor creating a public inconvenience.

Plaintiff was in his lawfully rented residence conversing with officers who were

there to investigate whether plaintiff had engaged in criminal trespass. **Plaintiff**

**created no public disturbance, and at all times during his interactions with**

**law enforcement was calm and cordial and spoke in a normal tone of voice. At**

**no point did his conduct even remotely come within the purview of Section 76-**

**9-102.** Considering the audible portion of Sergeant Young's body cam footage wherein the conversation is, in essence, "Well, what do we charge him with?" it can be inferred that the charging officers well knew that they were erroneously charging plaintiff with the crime of disorderly conduct in order to perpetrate an illegal arrest.

54.   The plaintiff was not guilty of failure to disclose identity, nor could any reasonable officer, especially Officer Huang in the instant context, have believed plaintiff was guilty of violating Section 76-8-301.5 of the Utah Code, given the totality of the circumstances, insofar as the text of that statute had been pulled up on plaintiff's desktop screen for approximately 15 minutes and the text (as well as the text of the internally-referenced Section 77-7-15) had been read aloud so that she could hear. Additionally, upon information and belief, and by her own statement, *"I literally looked up the code,"* Officer Huang had her phone pulled out and was referencing le.utah.gov criminal statutes. She therefore either had, or could have had, the statutes in front of her. The statutes, read together, make it clear that in order to find that plaintiff had violated Section 76-8-301.5, the officers must have stopped plaintiff in a public space (not in plaintiffs' own rented residence) pursuant to a reasonable suspicion to believe that plaintiff had committed or was in the act of committing or was attempting to commit a public offense. By contrast, the purpose of the officers' investigation was alleged criminal

trespass. Moreover, the officers had already determined that the crime of criminal trespass had not been committed, per Officer Mahoney's verbal representation. This being so, Section 76-8-301.5 had no application. The period that plaintiff had lawfully been subjected to a stop -- even interpreting that language beyond its application to include an investigation taking place at plaintiffs' own rented residence -- had passed. Nor, even if a lawful stop pursuant to Section 77-7-15 had been the basis for the investigation, did plaintiff violate the statute by refusing to produce his identification. The statute *does not require* that plaintiff produce identification. The statute requires that plaintiff disclose his name *or* date of birth. Plaintiff had disclosed his name *and* date of birth! Considering the audible portion of Sergeant Young's body cam footage wherein the conversation is, in essence, "Well, what do we charge him with?" it can be inferred that the charging officers well knew that they were erroneously charging plaintiff with the crime of failure to disclose identity in order to perpetrate an illegal arrest.

55.   Upon information and belief, in the Ellis Case, CHPD Sergeant Morzelewski, *immediately before arresting Mr. Ellis*, had the following exchange with him:

- *[Sergeant Eatchel: Give us your ID.*
- *…(continuing the verbal exchange described in ¶16)…]*
- Morzelewski: "You're not – we're not talking to you through the door.

- **Morzelewski: "Don't, don't puff up to me."** *[5 seconds prior to Morzelewski making this accusation, Mr. Ellis, who had recently been hobbled by a knee replacement surgery, began leaning against the corner of a wall with his left shoulder to relieve the weight on his knees, with his feet notably **away from** Sgt. Morzelewski]*
- Eatchel: "If you're refusing to give your ID" [adding on to Morzelewski's statement: "we're not talking to you through the door]
- Ellis: "What are you talking about?" [responding to Morzelewski's statement: "Don't, don't puff up to me"]
- **Morzelewski: "You're all gettin' up in my face."**
- Ellis: "I'm three feet away from you."
- Morzelewski: "You're not three feet away from me."
- Ellis: "Oh, here, let me record it so we can see it on tape, for real"
- Morzelewski: "**It's all right here, man**" *[Morzelewski gestures toward his body cam]*.
- Ellis: "No, I'll record it"

56.  Upon information and belief, Sergeant Morzelewski knew there would ultimately be an official investigation of the incident, and in saying to Mr. Ellis: *"Don't, don't puff up to me"* and *"You're all gettin' up in my face",* Sergeant Morzelewski was intentionally impairing the veracity of the record produced by cameras nearby, or in other words, "tampering with evidence," per a plain reading of U.C. §76-8-510.5.

57.  Upon information and belief, Sergeant Morzelewski, in saying to Mr. Ellis, *"It's all right here, man,"* was attempting to discourage Mr. Ellis from independently recording their interaction, or in other words, knowingly impairing the availability of a thing in the investigation he suspected (correctly) was coming,

or in other words, "tampering with evidence," per a plain reading of U.C. §76-8-510.5.

58.    Upon information and belief, when Mr. Ellis, possibly skeptical of Sergeant Morzelewski's claim, *"It's all right here, man,"* decided to exercise his right to record their interaction, Sergeant Morzelewski and Officer Mahoney then immediately and *"without warning or explanation, grabbed Mr. Ellis, yanked him out of his home, electrocuted him with a handheld conductive energy device, handcuffed him facedown in the hallway, wrenched his handcuffed arms behind his back toward his head, and left him handcuffed behind his back for nearly two hours."* In doing so, Sergeant Morzelewski and Officer Mahoney were intentionally impairing the availability of a thing or item, to wit: footage of the encounter independently recorded by Mr. Ellis, or in other words… _____

59.    It is not a crime in the state of Utah for a citizen to record his or her interaction(s) with law enforcement.

60.    Plaintiff, who like Mr. Ellis, had not committed any crime, had a right not to show an identification card to CHPD officers. All the same, CHPD officers were not going to have their authority questioned by a citizen with the audacity to exercise a right guaranteed by the Utah Constitution and the Constitution of the

United States, and see that citizen *just get away with it!* They decided to arrest plaintiff and take him to jail.

61.   CHPD officers did not have any articulable probable cause to arrest plaintiff, which probably explains why they did not so articulate when arresting him. **None of the four officers present articulated even the most basic explanation, such as** ***"you're under arrest,"*** **for why they had just placed handcuffs on plaintiff.** The arrest happened as follows: Officer Huang approaches plaintiff, says *"Alright [plaintiff], on your feet, stand up, turn around put your hands out of your pockets, k turn around, relax, stop,"* clinks handcuffs onto plaintiff, says *"widen your stance, k, little bit wider,"* and then immediately inspects plaintiffs driver's license, which Officer #4 had just seized from plaintiff pursuant to an illegal search and handed over to her, evincing yet again the officers' real motivation in arresting plaintiff.

62.   Upon information and belief, CHPD officers were not, on December 8, 2018, nor on May 5, 2021, nor are they *at the present day*, about to let something as trivial as ***no probable cause*** get in the way of arresting a citizen. On December 8, 2018, CHPD officers tampered with the evidence to justify their arrest of Mr. Ellis. On May 5, 2021, CHPD could not even articulate a *pretextual* justification for their arrest of plaintiff. Notwithstanding, Officer Huang did later -- in plain view of the plaintiff, who was handcuffed in the back of her vehicle -- *after* having

arrested him and *before* escorting him into the jail facility -- carefully review Utah criminal statutes, and knowing that an official proceeding (criminal prosecution of plaintiff) was about to take place, present an item which she knew to be false, to wit: her written statement which states, *"I took [plaintiff] into custody **under suspicion of** domestic violence related disorderly conduct and failure to disclose identity,"* thereby deceiving the prosecutor in the criminal case, a public servant. In other words, she tampered with evidence, per a plain reading of U.C. §76-8-510.5.

63.   Reiterated: there is no possibility that Officer Huang genuinely suspected plaintiff of *"domestic violence related disorderly conduct"* **or** *"failure to disclose identity,"* let alone both (see ¶ 53-54.)

64.   There is no evidence to suggest that CHPD does not continue the practice, to this day, of fabricating evidence for the purpose of arresting and criminally charging citizens. In fact, there is evidence to suggest the opposite.

65.   On October 27, 2021, Mr. Ellis filed a lawsuit against CHPD for violations of his civil rights. *Six days later*, Defendant Cottonwood Heights submitted these criminal charges against Mr. Ellis: (1) *Attempted Assault on a Police Officer*, (2) *Interference with Peace Officer Making Lawful Arrest*, and (3-4) the same alleged crimes that the plaintiff in the instant case was taken to jail for, i.e.: *Failure to Disclose Identity* and *Disorderly Conduct*. Prior to these charges

being filed, Mr. Ellis had first been charged criminally on December 8, 2018, the

day he was illegally arrested. Those charges were dropped on September 9, 2019.

Charges against Mr. Ellis were again filed and subsequently dropped by the State

on September 16, 2019 and March 18, 2021. In explaining the curious temporal

relationship between Mr. Ellis filing his civil action and being criminally charged

for a third time in connection with the events of December 8, 2018, Defendant

CHPD Police Chief Robert Russo *in a sworn statement* had this to say:

- "The City was unaware that the criminal charges the DA had brought against Mr. Ellis had been dismissed until we learned [of his lawsuit]"
- "At that time, I contacted the Cottonwood Heights Prosecutor, and told him that the City would be forwarding the case to his office for screening"
- **"This is not unusual at all."**

66.   In his own sworn statement, Mr. Russo acknowledges that it is *"not

unusual at all"* for Cottonwood Heights to re-file criminal charges against

somebody who is charged with a crime, has their charges dropped in the interest of

justice, and then later brings a civil action against CHPD. Plaintiff in the instant

case anticipates a very real risk that Cottonwood Heights will again levy frivolous

criminal charges against him and brings the instant claim anyway.

67.   Defendants in Mr. Ellis's civil action, including three of the same

defendants in the instant complaint, to wit, Cottonwood Heights, CHPD, and Mr.

Russo, as of the instant action's filing date, most recently moved to dismiss Mr.

Ellis's civil action arguing that because Mr. Ellis has pending criminal charges

against him in state court, the federal court where Mr. Ellis filed his civil action (and where plaintiff files the instant action) should per "*Younger* doctrine" abstain from hearing Mr. Ellis's claim until such criminal charges are resolved.

68.   Reiterated: Mr. Ellis filed his civil action in the federal court on **October 27, 2021**, and was then charged criminally in the state court on **November 02, 2021**.

69.   Further reiterated: this is the third time Mr. Ellis has been charged with crimes he allegedly committed on December 8, 2018. If the federal court abstains from hearing Mr. Ellis's case until the criminal charges are resolved, one cannot help but wonder if the federal court will hear Mr. Ellis's civil complaint before every party to the case has lived out all the days of their life.

70.   Upon information and belief, the decision to refer Mr. Ellis's case for criminal prosecution for the third time was, depending on the intent being either (a) *to hinder and/or delay a prosecution or investigation,* or (b) *deceive a public servant or any other party,* was either (a) *Obstruction of justice* per a plain reading of U.C. §76-8-S306, or (b) *Tampering with evidence* per a plain reading of U.C. §76-8-510.5.

71.   Reiterated: Defendants presently move to dismiss the civil action pending against them until the related criminal prosecution is finished, the same

criminal prosecution which they themselves initiated, and for which they did not even wait a complete week after the civil action's filing to initiate.

72.   Upon information and belief, when Mr. Ellis was being prosecuted, for the first time that is, CHPD employees including Chief Russo, Sergeant Morzelewski, Sergeant Eatchel, and Officer Mahoney collectively made a *representation to* the prosecutor that videos of the incident did not exist, which depending on their intent being either (a) *to hinder and/or delay a prosecution or investigation,* or (b) *deceive a public servant or any other party,* was evidence that CHPD employees including Chief Russo, Sergeant Morzelewski, Sergeant Eatchel, and Officer Mahoney were guilty of either (a) *Obstruction of justice* per a plain reading of U.C. §76-8-S306, or (b) *Tampering with evidence* per a plain reading of U.C. §76-8-510.5.

73.   Upon information and belief, CHPD regarding the same videos later acknowledged the existence of and provided a single video.

74.   Upon information and belief, CHPD regarding the same videos later acknowledged the existence of and provided *five more* videos.

75.   *Precisely* the same practice of "trickle disclosure" is observed in the instant complaint when CHPD initially released only Sergeant Young's body camera footage and then, after the criminal proceeding had been dismissed, five

more minutes of footage from Officer #4's body camera. One cannot help but question, *"How many more minutes of footage of plaintiff's encounter with CHPD officers exist?"* Similarly, one cannot help but marvel at the level of incompetency on display by CHPD. How does it happen that their chief of police disavows the existence of all body camera footage of an incident, then not only does one film get released once, which might be explained by a one-off staff slip-up, but *five* films are later released at two *different* points in time? One simply cannot help but wonder if maybe, just maybe, the effects of a policy training employees to fabricate, tamper with, destroy, fail to disclose, and/or minimize the existence of evidence in general eventually begins to take its toll on staff competency generally. Such policy as applied has been in place for, so far as known, at least four years.

76.   Upon information and belief (to wit: Case 2:19-cv-00341, also before this court, Document 96 Page 23), on May 29, 2018, a police officer named Davies, employed by CHPD, shot a 19-year-old individual named James in the back. James later died as a result of his injuries. A lieutenant for CHPD represented to James's parents that CHPD would soon release body cam footage of the incident. On June 13, 2018, CHPD released body cam footage, but it only showed the aftermath of the shooting. No footage of the shooting has ever been released by CHPD.

77.   Upon information and belief, in relation to the shooting incident, Defendant Police Chief Robert Russo, with intent to deceive reporters into thinking that Davies had not had a chance to put on his body camera that day, because his body camera had been at the police station and Davies had not been, told reporters that Davies *"was on his way to work"* when he had been called to the scene. By contrast, Davies in his own statement told a CHPD employee investigating the incident, "*I came in [to the station that day] a little bit earlier than normal.*" GPS data confirm that Davies' car was at the CHPD station that morning. Unless Chief Russo believed that no official investigation of the shooting would take place, or unless he had not bothered to perform even the most basic check of his understanding, such as could have been done by e.g. talking to Davies beforehand, then in making such representation to reporters, which he knew to be false, Mr. Russo, the very top of leadership at the department, was guilty of *Tampering with evidence* per a plain reading of U.C. §76-8-510.5.

78.   Upon information and belief, CHPD under the direction of Mr. Russo not only fails to properly train and supervise its law enforcement officers, it actively trains them in strategies and methods by which to fabricate evidence, tamper with evidence, destroy evidence, fail to disclose evidence, and minimize the existence of evidence, especially video recordings of their actions, to avoid

public accountability, and more pertinently, to avoid any liability that might arise as a result of its officers' misconduct during encounters with the public.

79.   Upon information and belief, after the shooting incident, James's parents met with Cottonwood Heights City Manager on November 12, 2018. Tim Tingey began his tenure as City Manager of Cottonwood Heights on October 15, 2018.  The victim's parents told Mr. Tingey that *"they were not interested in filing a lawsuit; instead, they were interested in understanding how [the shooting incident] could have happened, and in working [with Mr. Tingey] to obtain some type of meaningful reform."* During this meeting, Mr. Tingey claimed he did not know "the specifics of any mandatory camera policy" and that "the city was looking at police reform."

80.   While Mr. Tingey may not have been aware of any problem with CHPD's practice of consistently failing to produce body camera footage on November 12, 2018, he certainly became aware of such a problem on that day during his meeting with James's parents. By his own statement, *"the city [is] looking at police reform,"* Mr. Tingey has been aware of the need for reform at CHPD for the better part of three years.

81.   Mr. Tingey oversees CHPD. Mr. Russo reports directly to him. Upon information and belief, neither CHPD as an entity, nor Mr. Russo, nor any other

CHPD employee has ever been disciplined for fabricating evidence. They have acted -- and will continue to act -- with impunity in practicing the art of evidence-tampering. For now, Mr. Russo remains chief of police at CHPD and business goes on as usual. But for Mr. Russo's failure to ever discipline a CHPD employee for evidence tampering, plaintiff likely would not have been deprived of his federal and state civil rights on May 5, 2021. But for Mr. Tingey's failure to effect meaningful reform in CHPD policing over the years, plaintiff likely would not have been deprived of his federal and state civil rights on May 5, 2021.

82.   As a result of his unlawful detention and arrest, plaintiff was deprived of his freedom and his property, and he suffered damages. These damages were proximately caused by the events and conditions listed in this complaint.

## VIOLATIONS

### COUNT ONE

83.   The plaintiff was arrested without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution. All defendants are liable under 42 U.S.C. §1983, having acted under color of law and having deprived plaintiff of clearly established constitutional rights. Cottonwood Heights and CHPD are liable as entities under *Monell*. The remaining defendants are liable in their individual and official capacities.

## COUNT TWO

84.   The plaintiff was arrested without probable cause in violation of Article I, Section 14 of the Utah Constitution. All defendants are liable for punitive damages.

## COUNT THREE

85.   The plaintiff's rights under Utah common law and tort law were violated by Officer Huang, Officer Mahoney, Sergeant Young, and Officer #4. The wrongs inflicted upon the plaintiff by these defendants include false arrest, false imprisonment, malicious prosecution, intentional trespass, abuse of process, interference with contract rights, infliction of mental anguish, and violation of civil rights. Defendants CHPD and Cottonwood Heights are liable for plaintiff's injuries (under U.C. §63G-7-202) all of which were caused by Cottonwood Heights employees, during the performance of their duties, within the scope of their employment, and under color of authority.

## RELIEF

86.   Speedy injunctive relief against CHPD and/or Cottonwood Heights and/or Mr. Russo and/or any entities(s) under their influence capable of filing retaliatory criminal charges against plaintiff, who does not currently have any pending criminal charges against him.

87.   A determination that Section 63G-7-201 (4)(b) of the Utah Code violates the United States Constitution and the Utah State Constitution. As written it protects governmental entities and employees from suit if claimant injury results from *"assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, ..., or violation of civil rights"*, unless the conduct was sexually motivated. Its existence as written may encourage government employees to behave in ways they otherwise would not, but for a kind of perceived total immunity against suit granted by this Section.

88.   Finally, plaintiff demands a jury trial, and upon a verdict in his favor, asks that compensatory damages be assessed in an appropriate amount, as well as punitive damages for those claims for which they are available by law, and that he be awarded costs, fees, and all other relief to which he is entitled.

Respectfully Submitted,

**s/Oscar B. Jones**

Appearing Pro Se

1801 Chestnut Pl #428, Denver CO, 80202

oscarjonesslc@gmail.com

(801) 809-3009